IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. HUNTS HORSE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

LOGAN C. HUNTS HORSE, APPELLANT.

Filed March 11, 2025.    No. A-24-629.

Appeal from the District Court for Hall County: PATRICK M. LEE, Judge. Affirmed.

Gerard A. Piccolo, Hall County Public Defender, for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Logan C. Hunts Horse pled guilty to one count of second degree murder and no contest to one count use of a deadly weapon to commit a felony. The Hall County District Court sentenced him to consecutive terms of 64 to 94 years' imprisonment for the second degree murder and 24 to 40 years' imprisonment for the use of a deadly weapon to commit a felony. Hunts Horse appeals, claiming that the district court erred by imposing an excessive sentence. He also claims that his trial counsel was ineffective. We affirm.

## BACKGROUND

On April 27, 2023, the State filed an information charging Hunts Horse with six counts: count I, murder in the first degree in violation of Neb. Rev. Stat. § 28-303(1) (Reissue 2016), a Class IA felony; count II, use of a deadly weapon to commit a felony in violation of Neb. Rev. Stat. § 28-1205(1)(a) and (c) (Cum. Supp. 2024), a Class IC felony; counts III and V, use of a

deadly weapon to commit a felony in violation of § 28-1205(1)(a) and (b), each a Class II felony; count IV, robbery in violation of Neb. Rev. Stat. § 28-324 (Reissue 2016), a Class II felony; and count VI, conspiracy to commit robbery in violation of Neb. Rev. Stat. §§ 28-202(1) and 28-324 (Reissue 2016), a Class II felony.

On April 29, 2024, pursuant to a plea agreement, the State filed an amended information that dismissed counts II, IV, V, and VI of the information, and amended count I to a charge of second degree murder in violation of Neb. Rev. Stat. § 28-304 (Reissue 2016), a Class IB felony; count III remained the same (use of a deadly weapon to commit a felony). On May 1, Hunts Horse, pursuant to the plea agreement, pled guilty to count I, and no contest to count III of the amended information.

The State provided the following factual basis for the pleas:

[O]n or about March 9, 2023, at approximately ten o'clock in the morning, officers from the Grand Island Police Department and emergency personnel responded to . . . Fonner Park, R barn in particular, reference [sic] a male who was unconscious and not breathing. The male was identified as 62-year-old Todd Scherer who had just arrived that [sic] afternoon on March 8th to start working at Fonner Park.

Upon arrival, officers noticed Mr. Scherer was lying half on the mattress . . . and half off of the mattress, on his back in the bunk room, and he obviously appeared to be deceased at that time. Officers observed what appeared to be a gunshot wound to his abdomen. When they rolled him over onto his stomach, they noticed a head injury to the back of his head.

While on scene, officers spoke with some individuals that were present who reported that in the early morning hours of that same date, three subjects, . . . [L.R.], . . . Hunts Horse, and [A.K.], arrived at a hotel in Grand Island, knocked on the door, and [L.R.] advised the individuals inside of that hotel room that [Hunts Horse] had just shot a man at the R barn.

Upon learning that information, officers learned that . . . Hunts Horse was staying in another bunk room in the R barn. They went to that location where they found . . . Hunts Horse sleeping. They took him into custody and subsequently interviewed him.

During that interview, Mr. Hunts Horse admitted to shooting . . . Scherer. It was also learned through that interview and interviews of others that [were] present while Mr. Hunts Horse shot . . . Scherer -- [L.R.] was present, [A.K.] was present, and another individual named [L.H.] was also present on the scene. The four of them fled the R barn. Two of them went in an individual's vehicle by the name of [K.S.]. That would be [A.K.] and [L.R.]. Then [L.H.] and . . . Hunts Horse, fled the area in [L.H.'s] pickup truck. They all met at [a store] parking lot here in town, and while in that parking lot, . . . Hunts Horse, [A.K.], and [L.H.] all discussed going back to the R barn where Mr. Scherer was at and taking the money out of his wallet that he had on him earlier that evening.

[A.K.] and Mr. Hunts Horse returned back into [sic] the R barn, and while they went into the bunk room of Mr. Scherer's, they observed he was still alive. A bat was used and he was struck in the back of the head. His wallet was removed. The two of them then left the scene again. There was observed, I believe, about $189 -- $195 was in the wallet, and that was shared between [L.H.], Mr. Hunts Horse, and [A.K.].

The officers were able to recover the handgun. [K.S.] owned the handgun that was used to shoot Mr. Scherer. That handgun was recovered in the vehicle of [K.S.] as well as the bat. Those items were both tested.

The handle of the bat had a mixture of three individuals, and Mr. Hunts Horse's DNA was on that, included in that mixture of DNA. The other end of the bat was also tested and had a mixture of two individuals, and Mr. Scherer was included in the mixture of the DNA on the bat.

The handgun was also tested, and a swab of the trigger guard slide detected four individuals, and Mr. Hunts Horse was included in the DNA on that mixture as well.

Mr. Scherer was autopsied. During the autopsy, the findings were that the cause of death was a gunshot wound to the abdomen and also blunt force trauma to the back of the head, which caused fractures of his skull, epidural hemorrhage, subdermal and subarachnoid hemorrhage, occipital lobe and frontal lobe contusions.

All of these events did occur in Hall County, Nebraska.

The district court accepted Hunts Horse's pleas to count I (second degree murder) and count III (use of a deadly weapon to commit a felony) of the amended information and found him guilty of the same. The case was set for sentencing.

At the sentencing hearing on July 30, 2024, the district court sentenced Hunts Horse to consecutive terms of 64 to 94 years' imprisonment for count I (second degree murder) and 24 to 40 years' imprisonment for count III (use of a deadly weapon to commit a felony). Hunts Horse was given credit for 510 days' time served.

Hunts Horse appeals.

## ASSIGNMENTS OF ERROR

Hunts Horse assigns, restated, that (1) the district court erred in imposing an excessive sentence and (2) his trial counsel was ineffective for advising him to accept the plea agreement despite a letter from Dr. George Nichols regarding the victim's cause of death.

## STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

ANALYSIS

EXCESSIVE SENTENCE

Hunts Horse was convicted of one count of second degree murder, a Class IB felony, punishable by 20 years' to life imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024). He was sentenced to 64 to 94 years' imprisonment on that count. Hunts Horse was also convicted of one count of use of a deadly weapon to commit a felony, a Class II felony, punishable by 1 to 50 years' imprisonment. See *id.* He was sentenced to 24 to 40 years' imprisonment on that count. The sentences were to be served consecutively. See § 28-1205(4) (sentence for use of deadly weapon to commit felony must be served consecutively to any other sentence imposed). Both of Hunts Horse's sentences were within the statutory range. As such, we review the district court's sentencing determination for those offenses only for an abuse of discretion. See *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022) (when sentences imposed within statutory limits are alleged to be excessive, appellate court must determine whether sentencing court abused its discretion in considering well-established factors and applicable legal principles).

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Lierman, supra.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Hunts Horse was 21 years old at the time of sentencing. According to the presentence investigation report (PSR), Hunts Horse was single and had no dependents. He completed his schooling through the third grade, and did not have a GED. Hunts Horse was raised on the Pine Ridge Indian Reservation in South Dakota, but starting at the age of 18, he lived in other residences based on his employment. He was currently unemployed due to his incarceration, but "[s]ince the age of 18 [he] has worked training and breaking in horses." Hunts Horse "reported having a history of past alcohol abuse" and "admitted at the time of the offense he had been drinking heavily."

Hunts Horse's criminal history includes convictions in 2022 for "Minor in Possession-Ages 19/20" (fine), "Refuse to Submit to Test-1st Offense" (7 days' jail, 6 months' license revocation, interlock device, fine), and "Reckless Driving-1st Offense" (fine); and a conviction in 2023 for "Minor in Possession-Ages 19/20" (6 days' jail).

The probation officer conducted a "Level of Service/Case Management Inventory" as part of the presentence investigation and Hunts Horse was assessed as a high risk to reoffend. He scored in the "[v]ery [h]igh" risk range in the criminogenic risk factor domains for education/employment and companions. He scored in the "[h]igh" risk range in the domains for leisure/recreation, procriminal attitude, and antisocial pattern. He scored in the "[m]edium" risk range in the domain for criminal history. And he scored in the "[l]ow" risk range in the domains for family/marital and alcohol/drug problems.

The probation officer stated that Hunts Horse

reported a history of struggling with depression, suicidal thoughts, anxiety/racing thoughts, and mood stabilization. [He] has a long history of utilizing alcohol as an emotional escape.

Records also noted there [are] past reports of [him] saying he sees shadows. Throughout his schooling [Hunts Horse] was referred to special education classes. Records also indicated he is in the low range of intellectual functioning. [He] would benefit from further mental health interventions.

The probation officer also stated that Hunts Horse completed an "Independent Neuropsychological Evaluation," and it indicated that he "was in the 'exceptionally low range of intellectual functioning'"; "'his cognitive intellectual deficits are likely primarily developmental in nature, although he has also had a number of traumatic brain injuries, as well as severe alcohol abuse, which may have further affected his cognition'"; and "'[e]motionally, he also has had a history of significant depression with multiple psychiatric hospitalizations.'"

At the sentencing hearing, Hunts Horse's counsel stated that Hunts Horse "is 20 [sic], scared, alone, and in a terrible situation where a lot of people want him to be punished very severely." Counsel argued that Hunts Horse "was undoubtedly a child when he committed this crime," "[h]e has a child's education," and "[h]e has a child's intellectual ability." "Given his background, his history of using alcohol, and his extensive history of suffering injuries to his head, it can be assumed that his brain was not fully developed and was more like that of a teenager than as an adult." Hunts Horse was raised in poverty and was bullied based on his appearance by "roughnecks on the reservation." Additionally, "he has suffered serious, clinical, heart-wrenching depression," had previous suicide attempts, and was hospitalized. Counsel noted that Hunts Horse's criminal history does not include violence, and he accepted responsibility in this case by pleading "guilty." Hunts Horse "expresses remorse for the pain and loss that he caused."

Hunts Horse's counsel argued, "The truth is that this tragedy resulted when [Hunts Horse] wanted to help his young friends, when he wanted to protect them, and when it came time for him to protect himself, he committed the act of a low-intellect child who was sexually abused and bullied, and that is how he should be treated." "[T]his was not a cold-blooded murder," "[i]t was instantaneous." And "[i]t's mitigated by his youth, his mental health, his intellect, and the circumstances that led to it." Counsel submitted that the mitigating factors "call for a sentence at or near the low end of the applicable range and certainly do not favor a sentence towards the high end."

The State argued that "[t]his was a violent offense committed upon [the victim]" by Hunts Horse. "The fact that Mr. Hunts Horse has had a hard life does not justify or excuse his actions that day." "Hunts Horse asked [the victim] to leave his tack room" and "[the victim] walked out of the room." Hunts Horse "chose to follow [the victim] back to his tack room," "chose to take a gun with him back to the tack room," and "chose to shoot [the victim]"; Hunts Horse "could have just turned and walked away." "Hunts Horse was not a child at the time of this offense. He was of legal age. He was living on his own. He was working when he wanted to work, and he was choosing to live a life that he wanted to live." The State believed that "[b]ased on the totality of all of the evidence in the case, the violence that was perpetrated on [the victim]," a lengthy period of incarceration was appropriate.

The district court stated that it had reviewed the PSR "and its many attachments," including the victim impact statements, a neuropsychological evaluation, medical records, and the deposition

of one doctor and the report of another doctor. The court also stated that it considered all of the relevant sentencing factors and it went through each factor individually.

The district court addressed Hunts Horse by stating, "[D]espite the . . . many circumstances in your upbringing that failed you, this night was still about your choices"; "you chose to consume a significant amount of alcohol and . . . you chose to introduce a handgun into your drinking"; "after [the victim] left your room, you chose to follow [him] to his room"; "you shot [the victim]"; "[t]here's no evidence that you took any steps to help or assist [the victim] after you shot him"; "you fled" with "your co-defendants" and then later went back to the victim's room "to take his money"; upon returning to the victim's room "you believe he said something, representing to you that he was still alive," and then "instead of rendering aid or calling for help, you ensured his death either by striking him in the head with a bat or by your failure to render aid, allowing him to bleed out from the gunshot that you delivered"; "[a]fter stealing the wallet, you split the money" and "tried to dispose of the wallet." The court sentenced Hunts Horse as previously set forth.

On appeal, Hunts Horse argues that the district court "misapplied" the relevant sentencing factors, and that "[s]even of the eight factors favor Mr. Hunts Horse." Brief for appellant at 11.

To the extent that Hunts Horse's individual circumstances may weigh in favor of a more lenient sentence, our review of a sentencing order is limited to an abuse of discretion standard. See *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Because the appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life, a sentencing court is accorded very wide discretion in imposing a sentence. See *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). We find the district court did not abuse its discretion in sentencing Hunts Horse.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Generally, a voluntary guilty plea or plea of no contest waives all defenses to a criminal charge. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). Thus, when a defendant pleads guilty or no contest, he or she is limited to challenging whether the plea was understandingly and voluntarily made and whether it was the result of ineffective assistance of counsel. *Id.*

Hunts Horse has different counsel on direct appeal than he did in district court. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Lierman, supra.* Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.* A record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020).

When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Lierman, supra*. Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant

must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Blaha, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* In a plea context, deficiency depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Id.* When a conviction is based upon a guilty or no contest plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *Id.* The two prongs of the ineffective assistance of counsel test under *Strickland* may be addressed in either order. *State v. Blaha, supra*.

Hunts Horse claims that his trial counsel provided ineffective assistance when counsel advised him to enter a plea, pursuant to the plea agreement, despite a letter from Dr. Nichols "outlining [the victim's] cause of death"; "[i]f called to the stand, Dr. Nichols refutes the State[']s argument as to cause of death." Brief for appellant at 12. "Obviously prejudice results" because "[i]f Dr. Nichols is believed the State's evidence fails to show the death of [the victim] came from Mr. Hunts Horse's actions." *Id.* at 13.

Included in the PSR is the deposition testimony and report of Dr. Jeremy Berg, the forensic pathologist who performed the autopsy of the victim in this case. According to Dr. Berg, the victim's cause of death was a "[g]unshot wound of torso and blunt force injuries of head."

Also included in the PSR is a letter from Dr. Nichols to Hunts Horse's attorney. In the letter, Dr. Nichols, "a licensed physician certified in anatomic pathology, clinical pathology and forensic pathology," recounts that Hunts Horse's attorney asked him "to perform an independent cause of death determination in this case." Dr. Nichols stated he reviewed the victim's autopsy report and toxicology report, law enforcement reports, and photographs. Dr. Nichols concluded that there was a "lethal head trauma," but he eliminated the bat as the lethal weapon. Dr. Nichols stated that abdominal blood loss was "not the cause of death" and was "not a contributor to the death"; "It would, however, prove to be lethal if not quickly given emergency care and trauma surgery."

The State argues that, "[a]t best, Dr. Nichols' opinion created a conflict in the evidence, which a jury could have resolved in favor of the State." Brief for appellee at 14. The State further argues that "even if the jury accepted Dr. Nichols' opinion, it did not absolve Hunts Horse of responsibility for [the victim's] death," "[n]or did it provide a defense to the charges dismissed by the State as part of the plea agreement." *Id.* And "had Hunts Horse gone to trial, he could have been convicted on all six counts and sentenced to a much lengthier term of imprisonment." *Id.*

We find that Hunts Horse cannot show he was prejudiced because he has not shown a reasonable probability that but for the alleged deficiency of counsel, he would have insisted on going to trial rather than pleading guilty or no contest. The likelihood of success had the defendant insisted on going to trial is relevant to the prejudice analysis; it is relevant to the consideration of whether a rational defendant would have insisted on going to trial. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019). The likelihood of the defense's success had the defendant gone to trial should be considered along with other factors, such as the likely penalties the defendant would have faced if convicted at trial, the relative benefit of the plea bargain, and the strength of the State's case. *Id*.

As noted by the State, even if a jury accepted Dr. Nichols' opinion, Hunts Horse would not necessarily have been absolved of a finding of guilt. Hunts Horse admitted to shooting the victim, and even though it was Dr. Nichols' opinion that abdominal blood loss was "not the cause of death" and was "not a contributor to the death," he nevertheless acknowledged that it would have proven "to be lethal if not quickly given emergency care and trauma surgery." As pointed out by the district court, there was no evidence Hunts Horse took any steps to help the victim after Hunts Horse shot him, and instead, Hunts Horse fled the scene and then returned to take the victim's money. And despite signs the victim was still alive upon Hunts Horse's return, he again failed to render aid or call for help. Further, the jury would have also been able to consider the opinion of the forensic pathologist who performed the autopsy of the victim, and he opined that the victim's cause of death was a "[g]unshot wound of torso and blunt force injuries of head." Given the strength of the State's case, it is not likely that a rational defendant would have insisted on going to trial.

Additionally, Hunts Horse received a significant benefit from the plea agreement. He was originally charged with one Class IA felony (punishable by life imprisonment), one Class IC felony (punishable by a mandatory minimum of 5 years' imprisonment and up to a maximum of 50 years' imprisonment), and four Class II felonies (punishable by 1 to 50 years' imprisonment); additionally, pursuant to § 28-1205(4), sentences for three of the Class II felonies would have been required to be served consecutively to any other sentence imposed. However, pursuant to the plea agreement, Hunts Horse was charged with and convicted of one Class IB felony (punishable by 20 years to life imprisonment) and one Class II felony (punishable by 1 to 50 years' imprisonment); although the Class II felony was required by be served consecutively to any other sentence imposed, he was not subject to any mandatory minimum sentences.

Because Hunts Horse cannot show prejudice, his ineffective assistance of counsel claim fails.

CONCLUSION

For the reasons stated above, we find that the district court did not abuse its discretion in sentencing Hunts Horse. We further find that Hunts Horse's ineffective assistance of trial counsel claim fails. We therefore affirm his convictions and sentences.

AFFIRMED.